CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
March 18, 2025
LAURA A. AUSTIN, CLERK
BY: s/ S. Neily, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SHAWN TOLBERT,<br>Plaintiff,<br><br>v.<br><br>TROOPER SCHAEFFER, et al.,<br>Defendants. | )<br>)   Case No. 7:23-cv-00531<br>)<br>)<br>)<br>)   By: Michael F. Urbanski<br>)   Senior United States District Judge<br>)<br>) |

## MEMORANDUM OPINION

Shawn Tolbert, a Virginia inmate proceeding pro se, filed this civil action under 42 U.S.C. § 1983, alleging that defendants violated his rights under the Eighth and Fourteenth Amendments. The case is presently before the court on a motion to dismiss filed by defendants Douglas D. Schaeffer and Daniel L. Lundy, ECF No. 16. For the reasons set forth below, the motion to dismiss, ECF No. 16, is **DENIED**.

### I. Background

The following summary of the facts is taken from the complaint, amended complaint and the accompanying exhibits.[1] For purposes of the motion to dismiss, the facts are presented in the light most favorable to Tolbert. See Washington v. Hous. Auth. of the City of Columbia, 58 F.4th 170, 177 (4th Cir. 2023) (noting that a court reviewing a motion to dismiss must "accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff"). The court notes that Tolbert filed a complaint followed by an amended complaint, which the court construes as a supplement to the complaint. See Henderson v. Tower Fed.

---

1 The court may consider exhibits attached to the complaint when ruling on a motion to dismiss. See Sec'y of State For Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007).

Credit Union, No. 1:23-CV-01314-JRR, 2024 WL 1722555, *1 n.1 (D. Md. Apr. 22, 2024) (construing pro se amended complaint as supplement to complaint); see also Morings v. Wells, No. 7:16-CV-00139, 2018 WL 2124113, *1 n.2 (W.D. Va. May 8, 2018) (in pro se case where "[t]he amended complaint does not try to alter the allegations or claims in the original complaint but merely seeks to more accurately address the claims as to the correct defendants," deeming "the amended complaint as incorporating the original complaint" and "consider[ing] both the original and amended complaints as Plaintiff's pleading.").

Tolbert's claims arise from events occurring at 601 East Main Street, Dublin, VA 24084 on August 30, 2022. ECF No. 1 at 2. Tolbert alleges that defendants violated his Eighth and Fourteenth Amendment rights by using excessive force resulting in injury to plaintiff. Id. at 2. Specifically, Tolbert alleges that defendants knew, by nature of their jobs as Virginia State Troopers, the effects of flash bangs, OC spray, and tasers. ECF No. 9 at 4-9. Despite this knowledge, Tolbert alleges, defendants repeatedly deployed these devices without acknowledging their individual and cumulative effect(s) on Tolbert (i.e., that he was "disoriented," unable "to see or hear," unable "to move," "didn't even know what was going on," "was already not able to function," and/or "blacked out"), and ultimately injured Tolbert "to the point of [him] being put in the hospital" as a result of his injuries. Id. Tolbert alleges other state troopers, including Brian Dillon, testified to the effects of these devices, in particular the "overwhelming" and "extreme" nature of the gas that was deployed in the bus. See id. at 8; see also ECF No. 1-1 at 11-13 (Dillon stating "[c]hemical agents had been deployed and I, I didn't have a gas mask on, so couldn't… it started bothering me. So, I went ahead and got him [the deployed K9] and came out the bus and came out to get some fresh air.").

Tolbert attaches to his complaint a series of police statements and excerpts of court transcripts from May 16, 2023. See ECF No. 1-1. Alongside these records, Tolbert offers supporting facts to expand on the excerpts and statements. See id. at 1, 11, 14, 23. The police statements offer a record of the events that occurred on August 30, 2022. Defendant Schaeffer's statement, ECF No. 1-1 at 2-3, is dated August 31, 2022, one day after the incident in question. In his summary, Schaeffer writes:

> I and other members of Squad Six were requested by the U.S. Marshals to assist with a sighting of Shawn Michael Tolbert in Dublin, Virginia. Tolbert was the subject that had been on the run in Craig and Montgomery Counties in the weeks prior. Tolbert had active felony warrants for eluding and assault on law enforcement as well as being suspected of shooting a civilian's dog in Craig County. His criminal history included attempted [capital] murder of a police officer and malicious wounding.
>
> We were informed that Tolbert was staying in [an] abandoned church bus in the backyard of 601 E Main St. in Dublin, Virginia… The team approached the residence in the van … [and] started making announcements at the rear of the church bus and I through the windshield I observed Tolbert run to the front of the bus and barricade the door. Trooper Lundy and I ordered Tolbert to show us his hands and he refused. Tolbert began digging around with his hands out of our line of sight.
>
> A diversionary device was deployed at the rear of the bus in an attempt to coerce Tolbert out. Tolbert was ordered repeatedly to come out of the bus with his hands up to which he refused to comply. The decision was made to breach the bus door. The driver side window was breached and a diversionary device was deployed through it in order to distract Tolbert from the breaching of the bus door. Verbal commands were given once again to which there was no compliance. I could see Tolbert in the back of the bus actively trying to conceal himself and barricade further. The decision was made to deploy OC and the two rear windows were breached to deploy it. The OC had no effect and Tolbert continued to refuse to comply with commands. A Division 4 K9 arrived [on scene] and we decided to make entry onto the bus. The K9 was deployed into the bus and Troopers Kennedy, Lundy, and I made entry. The K9 alerted to the bed area in the back of the bus and was recalled by the handler. The team moved to the back of the bus and began moving furniture and the mattress out of our way. At that time we found a machete in the aisleway and removed it from the bus. Trooper Kennedy lifted up the wooden mattress box and Lundy and I saw Tolbert in a compartment underneath trying to pull the box back down. We moved more furniture out of the way to prepare to extract Tolbert from the compartment. I lifted the compartment lid all the way up and Tolbert made a furtive movement with his hands

3

not visible to us. Trooper Lundy deployed his issued taser and struck Tolbert. Tolbert was still actively not showing us his hands and making furtive movements so the taser was deployed 2 more times. Trooper Lundy and I then extracted Tolbert from the compartment and I placed him into handcuffs. Tolbert was removed from the bus, placed into the recovery position, and immediately attended to by EMS. He was transported to the hospital and we returned to the area office to be interviewed by Sgt. Dalton.

ECF No. 1-1 at 2-3. Defendant Lundy's statement, dated September 9, 2022, ECF No. 1-1 at 4, is similar. He describes the events in detail:

The homeowner at 601 East Main Street in Dublin advised Tolbert was living in a bus in his backyard. Myself and other members of Squad 6 responded to the address with a plan to takedown the suspect at 601 East Main Street. Once we were in place on each side of the bus a knock and announce started. I saw Tolbert run to the front of the bus and it appeared when he saw us he locked the door and ran to the rear of the bus. The suspect [didn't] make any attempt to communicate a diversionary device was placed in a rear compartment of the bus [with] no effect on the suspect. While holding lethal cover from the front of the bus I observed Tolbert hiding behind a seat when we saw me he darted to the rear of the bus. At that time the driver's window was breached and a diversionary device was placed in the window opening. At that time the side opening door was breached and Tolbert was advised to exit the bus he was under arrest still no movement. Gas was deployed in bus still no contact with Tolbert but I could see him wrapping up in blankets and digging in the floor. Another gas deployment was placed in the bus with no response but movement continued to come from the rear. Trooper Dillon arrived on scene with a patrol K9 he made several announcements with no response. Dillon cast the K9 in the bus several times with no alert from the K9. At that time Kennedy, Schaffer and Myself made entry into the bus Tolbert [wasn't] in view. While searching it appeared a compartment was under the bed. We moved the mattress off the compartment and some of the furniture so we had space to work. The first attempt to pull the cover up Tolbert was holding it shut and you could see the carpet moving. The compartment was lifted and Tolbert was under the cover with no compliance and his hands not in plain view. I deployed my issued taser the probes struck Tolbert on each side of the chest he still did not comply and started to move deeper in the compartment I cycled the taser a second time. Tolbert still had his hands in a position where I [couldn't] see him I cycled the taser a 3rd time and myself and Tpr. Schaffer physically pulled Tolbert out I removed the [cartridge] from the taser while Schaffer was cuffing Tolbert the Taser was cycled a 4th time but not contacted with Tolbert. Trooper Kennedy removed him from the bus EMS was contacted Tolbert was placed in the recovery position. EMS arrived shortly and transported Tolbert. Sgt Dalton interviewed all the individuals involved at the area office. I went to the Magistrates office and obtained a Obstruction/Resisting arrest charge.

4

ECF No. 1-1 at 4. Though not noted in his written statement or that of defendant Schaeffer, defendant Lundy testified that a second gas was deployed after the OC spray; he stated, "[a]fter OC gas, I, I think we went to the, uh, CS, CS gas, which is a different… gas. Started off on a low, low, uh, grade and then stepped it up from there." ECF No. 1-1 at 7 (plaintiff's exhibit C-2). Lundy stated that when defendants removed Tolbert from the bus, "there was no communication with him." Id. at 8 (plaintiff's exhibit C-3). As to the taser deployment, defendant Schaeffer described the time period between the first taser deployment and the consecutive deployments as very short, stating:

> Mr. Tolbert made a quick movement where we couldn't see his hands. Trooper Lundy deployed his taser, um, and it struck Mr. Tolbert. Um, as soon as the, the five seconds of the taser deployment was over, he [Tolbert] quickly moved his hands again, still wasn't following commands. Um, Trooper Lundy to deploy his taser two more times. And at that point we grabbed him and physically removed him from the compartment, and I placed him in handcuffs.

ECF No. 1-1 at 16. Schaeffer noted that subsequent to the tasing of Tolbert, "[w]e carried him off the bus and passed him off [to EMS]. He seemed to be having some sort of medical episode at that point." Id. at 17 (plaintiff's exhibit D-2). Schaeffer testified that earlier in the encounter, prior to the tazing of Tolbert, that Schaeffer did not notice any issues with Tolbert's ability to move. Id. Schaeffer testified that he was not aware of what Tolbert's medical issue was, only that Schaeffer knew that Tolbert was taken to the hospital subsequent to the arrest. Id. at 18 (plaintiff's exhibit D-3).

Tolbert also attached to his complaint a series of excerpts of medical records dated between August 30-September 6, 2022. See ECF No. 1-1 at 19-25. The medical records dated August 30-31, 2022, note that Tolbert was non-verbal upon arrival to the hospital. Id. at 19-22. Tolbert alleges that he "finally realized what was going on and [that] I was still injured"

five days later, on September 5, 2022. Id. at 23. At that point, medical records note that Tolbert "[s]tates he has ringing in his ears, headache that comes and [goes,] pain in elbows and his knees are popping." Id. at 24. On September 6, 2022, medical records state that Tolbert "voiced frustrations over his treatment the previous weeks stating he felt staff had not taken his delirium seriously." Id. at 25. The September 6, 2022, records also state that as of that date Tolbert was "with good mood and normal affect" but stated "he had current medical issues including dizziness and headache." Id. Earlier records from the same day show that Tolbert "state[d] he was tazed multiple times and things went off, and his ears are ringing and eyes are burning and he has a headache and would like to be checked out." Id. Tolbert alleges that the injuries resulting from the events of August 30, 2022, including "headache, ringing of ears, joints popping, and also dizziness… still are a part of my every day life." Id. at 23.

Based on these events, Tolbert filed this action under 42 U.S.C. § 1983. He seeks monetary damages from defendants in their individual capacities. ECF No. 1 at 3; ECF No. 9 at 3.

## II. Standard of Review

Defendants have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) and 12(b)(1). See ECF No. 17. To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While a complaint does not need "detailed factual allegations,"

merely offering "labels and conclusions," "naked assertion[s] devoid of further factual enhancement," or "a formulaic recitation of the elements of a cause of action will not do." Id. (alteration in original) (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 555, 557).

When a complaint is filed by a pro se litigant, it must be construed liberally. King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016). "Principles requiring generous construction of pro se complaints are not, however, without limits." Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985). A pro se complaint "must still 'state a claim to relief that is plausible on its face.'" Sakyi v. Nationstar Mortg., LLC, 770 F. App'x 113, 113 (4th Cir 2019) (quoting Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014)).

"A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction." Turner v. Thomas, 313 F. Supp. 3d 704, 708 (W.D. Va. 2018), aff'd, 930 F.3d 640 (4th Cir. 2019). "The burden of proving subject matter jurisdiction rests upon the plaintiff." Id. (citing Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). "Absent subject matter jurisdiction, a court must dismiss the action." Funkhouser v. Brown, No. 5:22-CV-056, 2024 WL 3572311, *4 (W.D. Va. July 29, 2024) (citing Evans v. B.F. Perkins Co., 166 F.3d 642, 653 (4th Cir. 1999)). "Dismissal under Rule 12(b)(1) is proper 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" Id. (quoting Evans, 166 F.3d at 647).

### III. Discussion

Tolbert seeks relief under 42 U.S.C. § 1983 for alleged violations of his constitutional rights, specifically, violations of his rights under the Eighth and Fourteenth Amendments. At

7

the time of the events giving rise to this complaint, plaintiff was not a convicted prisoner nor an arrestee; rather, defendants sought plaintiff in response to active felony arrest warrants for plaintiff. See ECF No. 17 at 3; ECF No. 1-1 at 2 ("Tolbert was the subject that had been on the run in Craig and Montgomery Counties in the weeks prior. Tolbert had active felony warrants for eluding and assault on law enforcement. As well as being suspected of shooting a civilian's dog in Craig County."). Therefore, the Eighth Amendment does not apply, as plaintiff was pre-arrest. See, e.g., Aleman v. City of Charlotte, 80 F.4th 264, 285 (4th Cir. 2023), cert. denied, 144 S. Ct. 1032, 218 L. Ed. 2d 187 (2024) ("Pursuant to the Supreme Court's precedent in Graham v. Connor, any claim 'that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment.'"). The Fourteenth Amendment does not apply, as plaintiff was not a pre-trial detainee at the time in question. See, e.g., Cooper v. Dyke, 814 F.2d 941, 948 (4th Cir. 1987). Despite this, the court will liberally construe plaintiff's complaint and consider his claims as brought under the Fourth Amendment given plaintiff's status as a pre-arrest suspect. See Corey v. Madden, No. 1:21-CV-00073-MR, 2021 WL 2321677, *1 n.1 (W.D.N.C. June 7, 2021) (construing pro se prisoner plaintiff's complaint as bringing a claim under the Fourth Amendment rather than the Eighth Amendment).

The court first evaluates whether it has subject matter jurisdiction over plaintiff's Fourth Amendment claim. The court then evaluates whether plaintiff has stated a claim under the Fourth Amendment.

### a. Subject Matter Jurisdiction

Defendants argue that the Rooker-Feldman and/or Heck v. Humphrey doctrines preclude the court from exercising subject matter jurisdiction over plaintiff's claim. The court addresses each in turn.

### i. Rooker-Feldman

The Rooker-Feldman doctrine bars district courts from reviewing state court decisions, except with regard to habeas corpus actions. See LaMar v. Ebert, 681 F. App'x 279, 286-287 (4th Cir. 2017). "In other words, Rooker-Feldman prevents a losing party in state court from 'complaining of an injury caused by the state-court judgment and seeking federal-court review and rejection of that judgment.'" Id. (citing Skinner v. Switzer, 562 U.S. 521, 531 (2011)). "Rooker-Feldman's jurisdictional bar 'extends not only to constitutional claims presented to or adjudicated by the state courts but also to claims that are inextricably intertwined with a state court judgment.'" Id. (quoting Jordahl v. Democratic Party of Virginia, 122 F.3d 192, 199 (4th Cir. 1997)). "Issues are 'inextricably intertwined' when, 'in order to grant the federal plaintiff the relief sought, the federal court must determine that the [state] court judgment was erroneously entered or must take action that would render the judgment ineffectual.'" McKnight v. Frederick Cnty. Dep't of Soc. Servs., No. 5:24-CV-00080, 2024 WL 4476564, *3 n.1 (W.D. Va. Oct. 11, 2024) (quoting Jordahl, 122 F.3d at 202)). "The 'controlling question' under the Rooker-Feldman doctrine is 'whether a party seeks the federal district court to review a state court decision and thus pass upon the merits of that state court decision.'" LaMer, 681 F. App'x at 286-287 (quoting Jordahl, 122 F.3d at 202)). "Importantly, a federal plaintiff 'encounters no Rooker-Feldman shoal' when presenting an independent claim, even

9

if 'the same or a related question was earlier aired between the parties in state court.'" Id. (citing Skinner, 562 U.S. at 532).

Here, plaintiff brings a claim under the Fourth Amendment, arguing defendants used excessive force resulting in injury during the events preceding plaintiff's arrest. ECF No. 1 at 2. Defendants base their Rooker-Feldman argument on the idea that by arguing the events leading to his arrest were the result of illegal force, "[Tolbert] believes his civil rights were harmed by the state court's findings of guilt." ECF No. 17 at 7. Thus, defendants argue, by "ask[ing] this Court to determine if actions taken by … Defendants during his arrest were unlawful, and therefore unconstitutional… [t]his is an invitation to overrule the trial court's findings of guilt," which is the type of federal review of state court decisions that is barred under Rooker-Feldman. Id. at 8.

As defendants note, Rooker-Feldman applies when four conditions are met:

(1) the federal court plaintiff lost in state court;
(2) the plaintiff complains of injuries caused by state-court judgments;
(3) the state court judgment became final before the proceedings in federal court commenced; and
(4) the federal plaintiff invites district court review and rejection of those judgments.

ECF No. 17 at 7 (quoting Willner v. Frey, 243 F. App'x 744, 746 (4th Cir. 2007)). Defendants admit, however, that "it does not appear that Tolbert challenged [in state court] his arrest based upon a Fourth Amendment violation for excessive force." Id. And, should the court award plaintiff the monetary damages he seeks, the court need not determine that the state court judgment was erroneously entered nor that the state court judgment must be rendered ineffectual. Defendants provide no case law support for their argument that by seeking § 1983 review of the events leading to plaintiff's arrest, plaintiff is challenging the underlying state

courts' findings of guilt, nor do defendants explain how providing plaintiff with the relief he seeks would render the underlying judgments erroneous or ineffectual. Therefore, the court finds that plaintiff's claim is not barred by Rooker-Feldman at this stage. However, should this case proceed, defendants may raise Rooker-Feldman at summary judgment should the underlying state court cases be entered into the record and demonstrate that plaintiff raised excessive force at the state court proceedings. See McKnight, 2024 WL 4476564 at *3 n.1.

### ii. Heck v. Humphrey

Defendants next argue plaintiff's claims are precluded by Heck v. Humphrey. "[W]hen a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." Heck v. Humphrey, 512 U.S. 477, 487 (1994). "But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." Id. Here, defendants state that Tolbert has been found guilty of the underlying offenses for which he was arrested on August 30, 2022. ECF No. 17 at 7. Defendants cite three court cases: Comm. v. Tolbert, CR23000351 (Pulaski Cnty. Cir. Ct.); Comm. v. Tolbert, CR22001111 (Montgomery Cnty. Cir. Ct.); Comm. v. Tolbert, CR22/00027 (Craig Cnty. Cir. Ct.). Of these court cases, the Virginia Judiciary Case Information System lists the offense date for the charge of obstruction of justice in CR23000351 as August 30, 2022, indicating the conduct for that case arose on the same date as the events plaintiff seeks to challenge in the

11

present case. Cases CR22001111 and CR22/00027 have offense dates of August 11 and August 13, 2022, respectively. "The Fourth Circuit has reasoned that if an officer's alleged excessive force caused the arrestee to engage in the conduct underlying his conviction, then a successful § 1983 suit would necessarily imply invalidity of that conviction, since a person cannot be found guilty of resisting arrest if he is simply protecting himself, reasonably, against an officer's unprovoked attack or use of excessive force." Smith v. Maryland State Police Dep't, No. CV GLR-18-2836, 2019 WL 4805680, *6 (D. Md. Sept. 30, 2019) (citing Riddick v. Lott, 202 F.App'x 615, 2006 WL 2923905, *2 (4th Cir. Oct. 12, 2006)). But, "[i]f... there is no legal nexus between the officer's excessive force and the arrestee's resistance and assault—that is, the alleged force occurred, independently, either before the arrest, or after the arrestee's resistance had clearly ceased, then a successful § 1983 suit for excessive force would not imply invalidity of the conviction." Id. Further, "courts have ruled that Heck does not bar § 1983 actions alleging excessive force despite a plaintiff's conviction for resisting arrest because a 'state court's finding that [a plaintiff] resisted a lawful arrest ... may coexist with a finding that the police officers used excessive force to subdue [the plaintiff].'" Id. (collecting cases).

Here, plaintiff appears to have been convicted of misdemeanor obstruction of justice in Pulaski County Circuit Court for offenses committed on August 30, 2022. See Comm. v. Tolbert, CR23000351 (Pulaski Cnty. Cir. Ct.); see also ECF No. 1-1 at 5 (defendant Lundy stating that after Tolbert was handed off to EMS, "I went to the Magistrates office and obtained a[n] Obstruction/Resisting arrest charge."). Therefore, in order to survive Heck v. Humphrey, plaintiff's claim must demonstrate that defendants' use of excessive force must have occurred after plaintiff stopped resisting and/or obstructing. See Smith, 2019 WL

4805680 at *6. Plaintiff alleges he was rendered "disoriented," unable "to see or hear," unable "to move," "didn't even know what was going on," "was already not able to function," and/or "blacked out" due to defendants' deployment of flash bangs, OC spray, and tasers. ECF No. 9 at 4-9. Liberally construed, plaintiff has alleged that he had stopped resisting arrest at a certain point. See, e.g. ECF No. 9 at 5 ("Once Daniel L Lundy came on to the bus after deploying flash bangs and gas [where] I was not able to see or hear [he] [chose] to tase me 3 times with multiple officers with him. I was not able to move or didn't even know what was going on after the first time I was tased…"); ("During research of being tased if tased 1 time it renders your ability to move for at least 10 or 15 seconds and [there]… was no need for three times of tasing when I was already not able to function"); ("Douglas D. Schaeffer decided to come on to the bus with multiple State Police Officers and I was already not able to see or hear [but he] assisted in me being tased 3 times when the first time I was tased I blacked out…"); see also Smith, 2019 WL 4805680 at *7 (finding defendants' excessive force bore no legal nexus to plaintiff's resisting arrest charge where the excessive force came after plaintiff had stopped resisting). Therefore, plaintiff has alleged that his excessive force claim has an independent factual basis from the obstruction charge as the court understands the offense conduct underlying that charge.[2] Thus, plaintiff's excessive force claim is not barred by Heck v. Humphrey. However, should the case proceed, defendants may raise Heck v. Humphrey at summary judgment should the underlying state court charging materials and court transcripts be entered into the record and demonstrate that plaintiff's obstruction charge

---

2 Defendants have not substantiated the offense conduct for which plaintiff was charged in each of the three state court cases they cite.

was predicated on his conduct for all events occurring on August 30, 2022, leading up to plaintiff's arrest and/or detainment by police and/or that plaintiff raised his excessive force claim at Pulaski County state court proceedings.

Therefore, defendants' 12(b)(1) motion to dismiss is **DENIED**.

### b. Fourth Amendment

Finding that plaintiff's claim is not barred by Rooker-Feldman or Heck v. Humphrey based on the materials currently before the court, the court proceeds to consider whether plaintiff has stated a claim under § 1983 for a violation of plaintiff's Fourth Amendment rights. "To state a claim under § 1983, a plaintiff must allege that he was deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Thomas v. Salvation Army S. Terr., 841 F.3d 632, 637 (4th Cir. 2016). The Fourth Amendment prohibits unreasonable seizures, and includes a bar on police officers using excessive force to seize a citizen. See Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003). The court evaluates claims of excessive force based on a standard of objective reasonableness. Id. (citing Graham v. Connor, 490 U.S. 386, 395, 399 (1989)). The court "consider[s] the facts 'from the perspective of a reasonable officer on the scene,' and avoid[s] judging the officer's conduct with the '20/20 vision of hindsight,' recognizing that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" Id. (citing Graham, 490 U.S. at 396-97). The court does not consider the intent or motivation of the officer, but rather considers "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Id. In conducting this analysis, the court considers the

14

facts and circumstances of each case, including three main factors: "the severity of the crime at issue," whether the "suspect poses an immediate threat to the safety of the officers or others," and whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." Id. The court also considers the extent of the plaintiff's injury. Id. (citing Rowland v. Perry, 41 F.3d 167, 174 (4th Cir.1994)).

As to the first factor, defendants allege plaintiff was, at the time of the events in question, "a fugitive from justice, fleeing from law enforcement after committing assault and battery of a law enforcement officer and using a firearm to shoot a civilian's dog."[3] ECF No. 17 at 12. Plaintiff "was expected to be armed." ECF No. 1-1 at 4. As the Fourth Circuit has recognized that the first factor "is intended as a proxy for determining whether 'an officer [had] any reason to believe that [the subject of a seizure] was a potentially dangerous individual,'" Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 900 (4th Cir. 2016), this factor weighs in favor of defendants' having justification for their use of force because plaintiff was expected to be armed, and was a fugitive from justice for crimes involving violence.

The second and third factors initially follow the first. As plaintiff was expected to be armed, was a fugitive from justice, and did resist arrest in the vehicle initially, he can be considered to pose an immediate threat to the safety of law enforcement at the beginning of the events in question. Plaintiff did not exit the vehicle when defendants performed their initial

---

3 Notably, defendants cite to ECF No. 1-1 at 2 for this allegation. However, the court notes that ECF No. 1-1 at 2 (defendant Schaeffer's August 30, 2022 report) and ECF No. 1-1 at 4 (defendant Lundy's September 9, 2022 report) only state that plaintiff was "suspected of shooting a civilian's dog" and "had possibly shot 2 dogs," respectively.

knock and announce, nor after defendants introduced flash bangs, deployed OC spray, and had a K9 alert. See ECF No. 1-1 at 2-4. Once defendants boarded the vehicle, defendants recovered a machete. ECF No. 1-1 at 3. Therefore, a degree of force was justified. However, that degree of force must be reasonably calculated to prevent plaintiff's flight. See Est. of Armstrong, 810 F.3d at 901. Plaintiff was verbally non-responsive to defendants at the time they boarded the vehicle, and hidden in a compartment beneath a bed. ECF No. 1-1 at 4. When defendants lifted the compartment cover, plaintiff did not comply with direction, and did not have his hands in plain view. Id. At that point, defendant Lundy deployed his taser for the first time, striking plaintiff. Id. Defendant Lundy states that after he struck plaintiff with the taser for the first time, plaintiff "still did not comply and started to move deeper in the compartment." Id. Defendant then "cycled the taser a second time," but plaintiff "still had his hands in a position where I [couldn't] see him [so] I cycled the taser a third time." Id.; see also ECF No. 1-1 at 3 (defendant Schaeffer describing the taser deployment as "I lifted the compartment lid all the way up and Tolbert made a furtive movement with his hands not visible to us. Trooper Lundy deployed his issued taser and struck Tolbert. Tolbert was still not actively not showing us his hands and making furtive movements so the taser was deployed 2 more times."). Plaintiff alleges that "I was not able to move or didn't even know what was going on after the first time I was tased" and that "the first time I was tased I blacked out." ECF No. 9 at 5, 8. Defendants were justified in their initial deployment of the taser because defendant presented a potential threat to the safety of the law enforcement officers. Plaintiff alleges that at the time of the second and third taser deployment by defendants, plaintiff was not physically able to respond to defendants' requests. Defendants allege the taser was

deployed a second and third time due to plaintiff's non-compliance, including both that plaintiff was continuing to resist arrest by "mov[ing] deeper in the compartment" and continuing to present a potential threat to safety by "actively not showing us his hands and making furtive movements." ECF No. 1-1 at 3-4. When drawing all reasonable inferences in plaintiff's favor, as the court must at the motion to dismiss stage, plaintiff sufficiently alleges that defendants engaged in excessive force in violation of plaintiff's Fourth Amendment rights, at least as to the second and third deployment of the taser.

### c. Qualified Immunity

Defendants may raise qualified immunity at the motion to dismiss stage. Brewer v. VanMarter, No. 7:24-CV-00087, 2024 WL 2131521, *2 (W.D. Va. May 13, 2024) (citing Occupy Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013)). "'Qualified immunity is an immunity from suit,' and early consideration of a qualified immunity defense is consistent with the doctrine's purpose of ensuring implausible claims against government officials are resolved 'at the earliest possible stage in litigation' and prior to discovery." Id. (quoting Pearson v. Callahan, 555 U.S. 223, 231-32 (2009), alterations adopted). "Accordingly, the court must rule on a qualified immunity defense raised in a motion to dismiss." Id. (referencing Mays v. Sprinkle, 992 F.3d 295, 302 n.5 (4th Cir. 2021)).

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that

17

right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." Reichle v. Howards, 566 U.S. 658, 664 (2012) (cleaned up). "Although a plaintiff may prove that an officer has violated certain constitutional rights, the officer nonetheless is entitled to qualified immunity if a reasonable person in the officer's position 'could have failed to appreciate that his conduct would violate those rights.'" Meyers v. Baltimore Cnty., Md., 713 F.3d 723, 731 (4th Cir. 2013) (quoting Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th Cir.1991)).

The court construes plaintiff's complaint to base its excessive force claim around defendant Lundy's deployment of the taser three times, and defendant Schaeffer's "assist[ance]" in Lundy's conduct. See ECF No. 9 at 4-8. As the court concluded above, defendant Lundy's first deployment of the taser does not amount to an unreasonable or excessive use of force as plaintiff was not responding to commands and hiding in a compartment—hallmarks of a plaintiff resisting arrest. Defendants also expected plaintiff to be armed, and had found a machete in the vehicle, further underscoring the objective reasonableness under the circumstances for the first deployment of the taser.

In addressing whether defendants are entitled to qualified immunity as to defendant Lundy's second and third deployments of the taser, the court emphasizes that its analysis is based on plaintiff's version of the facts as drawn from the complaint, amended complaint, and associated attachments. "Although a jury ultimately may find that the [defendants'] version of the events is more credible, we are not permitted to make such credibility determinations when considering whether a police officer properly was held immune from suit under the doctrine of qualified immunity." Meyers v. Baltimore Cnty., Md., 713 F.3d 723, 733 (4th Cir. 2013).

Although the court finds that defendant Lundy's first use of the taser was objectively reasonable, the court must consider the reasonableness of the second and third deployments separately as "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated.'" Id. (quoting Waterman v. Batton, 393 F.3d 471, 481 (4th Cir.2005)). Here, plaintiff asserts that the justification for defendant Lundy's initial use of the taser had disappeared at the time of the second and third taser deployments as he was physically unable to respond to defendants' requests at that point in time, and that defendant Lundy knew or should have known, due to his experience as a law enforcement officer, that "if tased 1 time," one is rendered unable "to move for at least 10 or 15 seconds." ECF No. 9 at 6. Despite this, plaintiff's pleadings also demonstrate that the taser was deployed a second and third time due to plaintiff's non-compliance, including both that plaintiff was continuing to resist arrest by "mov[ing] deeper in the compartment" and continuing to present a potential threat to safety by "actively not showing us his hands and making furtive movements." ECF No. 1-1 at 3-4; see also ECF No. 1-1 at 16 ("as soon as the, the five seconds of the [first] taser deployment was over, [plaintiff] quickly moved his hands again, still wasn't following commands."); Id. at 4 ("I deployed my issued taser the probes struck Tolbert [for the first time]... he still did not comply and started to move deeper in the compartment [so] I cycled the taser a second time."): Id. ("Tolbert still had his hands in a position where I [couldn't] see him [so] I cycled the taser a 3rd time."). The court cannot conclude on the current record that plaintiff's constitutional rights were violated, nor that defendants' actions were objectively reasonable or unreasonable, if in fact plaintiff's rights were violated. Thus, the court cannot grant defendants qualified immunity at this time. On a

19

more fully developed record, defendants may reassert this defense.

IV. Conclusion

For the reasons set forth herein, the motion to dismiss filed by defendants Lundy and Schaeffer, ECF No. 16, is **DENIED**. An appropriate order will be entered.

Entered: March 13, 2025

Michael F. Urbanski
Senior United States District Judge