CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
September 22, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ M. Poff
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **SHAWN TOLBERT,** | ) | |
| **Plaintiff,** | ) | **Case No. 7:23-cv-00531** |
| | ) | |
| **v.** | ) | |
| | ) | **By: Michael F. Urbanski** |
| **TROOPER DOUGLAS D. SHAEFFER** | ) | **Senior United States District Judge** |
| **and TROOPER DANIEL L. LUNDY,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Shawn Tolbert, an inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983 against Trooper Douglas D. Shaeffer and Trooper Daniel L. Lundy. Tolbert claims that the defendants used excessive force during the course of arresting him on August 30, 2022. The defendants have filed a motion for summary judgment to which Tolbert has responded. For the reasons set forth below, the motion for summary judgment, ECF No. 45, is **DENIED**.

### I. Background

The following summary of the evidence is derived from Tolbert's verified pleadings, Tolbert's deposition, the defendants' sworn declarations, and other exhibits submitted by the parties.[1] The facts are either undisputed or presented in the light most favorable to Tolbert, the nonmoving party on summary judgment.

[1] The verified pleadings include Tolbert's original complaint and his amended complaint. See Goodman v. Diggs, 986 F.3d 493, 499 (4th Cir. 2021) (concluding that a plaintiff's "original and first amended complaints, which were verified and based on [the plaintiff's] personal knowledge, . . . were the equivalent of opposing affidavits" on summary judgment).

### A. Events Preceding Tolbert's Arrest

The events giving rise to this action occurred in Dublin, Virginia, on August 30, 2022. On that date, Trooper Shaeffer and Trooper Lundy were employed by the Virginia State Police ("VSP") and assigned to the Special Operations Division's Squad Six Tactical Team ("Squad Six"). Shaeffer Decl., ECF No. 46-1, ¶ 1; Lundy Decl., ECF No. 46-2, ¶¶ 1–2.

On August 30, 2022, Dublin Police Chief Dennis Lambert contacted Squad Six to assist with a sighting of Tolbert in Dublin. At that time, Tolbert was a fugitive from justice in two counties, and Squad Six had been advised that he was the subject of outstanding warrants for "felony eluding and assault on a law enforcement officer, obstruction of justice, reckless driving, as well as shooting a civilian's dog while evading arrest." Shaeffer Decl. ¶¶ 4–5; Lundy Decl. ¶ 6. Squad Six had also been advised that Tolbert's criminal history included "attempted capital murder of a police officer, malicious wounding, and firearm violations." Shaeffer Decl. ¶ 6; Lundy Decl. ¶ 7.

Immediately prior to August 30, 2022, Tolbert had led the VSP's Special Operations Division on a two-week manhunt in Division Six. During the manhunt, Squad Six traced Tolbert's whereabouts through Craig County, Virginia, where they came upon a structure believed to have been broken into by Tolbert. Inside the structure, Trooper Schaeffer observed a dog that had been shot with a firearm. Shaeffer Decl. ¶ 7. That information was shared with other members of Squad Six, including Trooper Lundy. Lundy Decl. ¶ 8.

On the afternoon of August 30, 2022, Squad Six, at the direction of Sergeant Mavredes, was deployed to execute Tolbert's outstanding warrants at a private residence in Dublin. Shaeffer Decl. ¶ 9; Lundy Decl. ¶ 10; Defs.' Ex. 3, ECF No. 46-3, at 15. The team had been

informed that Tolbert was seeking refuge in a church bus on the property and that he possessed a machete with the intent to use it as a weapon. Based on Tolbert's criminal history and the information provided, Trooper Shaeffer and Trooper Lundy believed that Tolbert was armed, possibly with a machete and a firearm, and dangerous. Shaeffer Decl. ¶¶ 8–9; Lundy Decl. ¶¶ 9–10.

While searching the property with the owner's consent, Troopers Shaeffer, Lundy, and Keesee went to the left of the main house on the property, while Sergeant Mavredes and Troopers Kennedy and Holiday went to the right. Both sets of officers arrived at a converted church bus being used as a camper. The owner of the property told the officers that Tolbert was inside. All six officers, who were wearing official uniforms displaying badges and VSP patches, began knocking on the bus, announced that they were with the VSP, and demanded that Tolbert exit the bus with his hands visible. Shaeffer Decl. ¶¶ 10–12; Lundy Decl. ¶¶ 11–13. The parties provide different accounts of what transpired next.

**B. Defendants' Account of the Arrest**

Troopers Shaeffer and Lundy, for their part, assert that they were positioned at the front of the church bus and saw Tolbert run to the front of the bus and barricade the door. He refused to show his hands and began digging through items on the bus with his hands out of the officers' sight. Sergeant Mavredes then ordered the deployment of two diversionary devices. After the first device was deployed at the rear of the bus, Tolbert failed to comply with additional orders to exit the bus with his hands up. Another diversionary device was deployed through the window on the driver's side, and Tolbert continued to fail to comply with the officers' orders. Shaeffer Decl. ¶¶ 12–13; Lundy Decl. ¶¶ 13–14.

Troopers Shaeffer and Lundy assert that they could both see Tolbert in the back of the bus attempting to conceal himself. At that point, the decision was made to deploy OC gas. According to the defendants, the OC gas had no effect on Tolbert. He continued to refuse to comply with the officers' orders and attempted to conceal himself. Shaeffer Decl. ¶ 14; Lundy Decl. ¶ 15.

A K-9 unit was subsequently deployed on the bus, and Sergeant Mavredes ordered Troopers Shaeffer, Lundy, and Kennedy to enter the bus at 3:50 p.m. The K-9 alerted to the rear of the bus, so the officers headed toward that area. While moving furniture out of their way, the officers found a machete. However, they had not located any firearm at that point, including the firearm they believed had been used to previously shoot a dog. Shaeffer Decl. ¶¶ 15–16.

Trooper Kennedy proceeded to lift up a wooden mattress box, and both defendants saw Tolbert in the compartment underneath attempting to pull the box back down over top of him. As Trooper Shaeffer lifted the box compartment lid open, Tolbert reportedly made furtive movements concealing his hands inside the container. He refused to come out with his hands up and "continued to make movements while concealing his hands under material and carpets in the compartment." Shaeffer Decl. ¶ 17; Lundy Decl. ¶¶ 17–18. Thus, at that time, Trooper Lundy deployed his taser the first time. Shaeffer Decl. ¶ 17; Lundy Decl. ¶ 18.

According to the defendants, Tolbert continued to make furtive movements concealing his hands after the taser cycled and stopped. The defendants maintain that they "considered Tolbert to be a continued threat, believing it was possible he was in possession of the firearm used in Craig County." Shaeffer Decl. ¶ 18; Lundy Decl. ¶ 19. Consequently, Trooper Lundy

deployed his taser a second time, after which Tolbert allegedly continued to make furtive movements with his hands concealed inside the compartment. Trooper Lundy then deployed his taser a third time. The defendants maintain that the third strike immobilized Tolbert, and they were able to extract him from the hiding space and place him under arrest. Shaeffer Decl. ¶¶ 18–20; Lundy Decl. ¶¶ 19–21.

### C. Tolbert's Account of the Arrest

In his verified pleadings, Tolbert alleges that he was "disoriented" following the deployment of the flash-bang diversionary devices and that he was "not able to see or hear" as a result of the combined effects of the diversionary devices and the OC spray. Am. Compl., ECF No. 9, at 5. He further alleges that he "blacked out" and was unable to move or function after being tased the first time Id. at 5, 9. Nonetheless, Lundy tased Tolbert three times "with multiple officers with him." Id. at 5.

During his deposition, Tolbert testified that he was sleeping in the back of the bus when the officers arrived and that he realized someone was there to arrest him when he heard a "boom" sound akin to someone being shot. Tolbert Dep., ECF No. 48-1, at 17–19.[2] He also testified that he "heard a little bit of commotion first, . . . like maybe hollering." Id. at 20. When Tolbert sat up, the officers "set the flash grenade off," and Tolbert "dove into the floor." Id. at 21. He continued to hear "a bunch of hollering" as other flash-bang devices were deployed "multiple times." Id. Tolbert testified that he could not see, hear, or function, and that he became off balance and fell when he attempted to stand. Id. at 22. The bus then became

[2] When citing to Tolbert's deposition transcript, the court will refer to the page numbers that appear on the bottom right-hand corner of each page.

"smoky" as the officers "started setting off the gas," and Tolbert had difficulty breathing. Id. at 24–25.

Tolbert testified that he proceeded to crawl "all the way up under the bed," perhaps in an effort to get out of the bus. Id. at 25; see also id. ("I'm not for sure . . . . I remember crawling."). He also remembers "being electrocuted" by the taser, after which he became "unconscious." Id. at 26; see also id. at 28 ("I got electrocuted. I was gone after that."). Although Tolbert acknowledged that he could "understand [being tased] maybe once," he testified that the taser was deployed additional times while he was "unconscious." Id. at 35. Likewise, in response to the defendants' motion for summary judgment, Tolbert asserts that he was tased multiple times even though he was "unconscious after the first time." Pl.'s Resp. Opp'n Mot. Summ. J., ECF No. 51, at 4.

### D. Events Following the Arrest

After being arrested for the outstanding warrants and for obstruction of justice based on the encounter with Squad Six, Tolbert was "placed in the recovery position and eventually transported by Emergency Medical Services to a local hospital at 4:12 p.m. for observation." Shaeffer Decl. ¶ 22. Medical records from LewisGale Hospital Pulaski ("LewisGale") indicate that Tolbert was "not verbal and not following commands on arrival" and that his initial presentation appeared to be "consistent with nonmalignant retarded catatonia with elements of mutism, inhibited movement with severe psychomotor retardation, rigidity, negativism and staring." Compl. Ex., ECF No. 1-1, at 19, 21. Tolbert was discharged from LewisGale the following day with a diagnosis of conversion disorder and transported to the New River Valley Regional Jail. See Tolbert v. Quesenberry, No. 7:23-cv-00534, 2026 WL 810272, at *1–2 (W.D.

Va. Mar. 24, 2026); Tolbert v. Kletzing, No. 7:23-cv-00530, 2026 WL 497760, at *3 (W.D. Va. Feb. 23, 2026).[3]

Of the warrants executed by Squad Six on August 20, 2022, Tolbert was ultimately convicted of felony eluding in Roanoke County Circuit Court; felony assault on a law enforcement officer in Craig County Circuit Court; and felony eluding in Montgomery County Circuit Court. He was also convicted of a misdemeanor count of obstruction of justice in Pulaski County Circuit Court. See Defs.' Ex. 3, ECF No. 46-3, at 27-35 (warrants); Defs.' Ex. 6, ECF No. 46-7 (conviction orders).

## II. Procedural History

Based on the events that occurred on August 30, 2022, Tolbert filed this civil action under 42 U.S.C. § 1983 against Trooper Shaeffer and Trooper Lundy. Tolbert claims that the defendants used excessive force in the course of arresting him. He seeks to recover monetary damages against the defendants in their individual capacities.

The defendants previously moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and that motion was denied. See Mem. Op. and Order, ECF Nos. 29 and 30. The defendants have since moved for summary judgment. The defendants argue that no use of excessive force occurred during the course of procuring Tolbert's arrest and that they are entitled to qualified immunity. Tolbert has responded to the motion for summary judgment, and it is ripe for disposition.

[3] Tolbert filed separate lawsuits against doctors and nurses at LewisGale and officials at the New River Valley Regional Jail. The court may take judicial notice of the record in those cases. See Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir. 1989) (noting that "the most frequent use of judicial notice of ascertainable facts is in noticing the content of court records") (internal quotation marks omitted).

## III. Standard of Review

Under the Federal Rules of Civil Procedure, a party may move for summary judgment on a claim or defense. Fed. R. Civ. P. 56(a). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. When ruling on a motion for summary judgment, the court "must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." Shaw v. Foreman, 59 F.4th 121, 129 (4th Cir. 2023). The court may not "weigh the evidence or make credibility determinations." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 569 (4th Cir. 2015). Instead, the court is tasked with determining "whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

## IV. Discussion

### A. Excessive Force

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. "Claims of excessive force during an arrest are examined under the Fourth Amendment's 'objective reasonableness standard.'" Nichols v. Bumgarner, 173 F.4th 511, 520 (4th Cir. 2026) (quoting Graham v. Connor, 490 U.S. 386, 388 (1989)). "Law enforcement is not permitted to use excessive force when arresting a suspect even if probable cause for arrest exists." Payne v. Moser, 172 F.4th 408 (4th Cir. 2026).

The "central inquiry" of a Fourth Amendment excessive force claim is "whether the officer's actions were objectively reasonable under the totality of the circumstances." Id. To

evaluate the reasonableness of an officer's actions, courts consider the information possessed by the officer at the moment that force was employed. Id. "This inquiry reflects the reality that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. (quoting Graham v. Connor, 490 U.S. at 396–97).

In Graham v. Connor, the Supreme Court articulated several non-exclusive factors to guide a court's inquiry into whether an officer's actions were objectively unreasonable in violation of the Fourth Amendment. 490 U.S. at 396. The factors include: (1) the "severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." Id. Of these factors, the second factor has been described as "the most important." Lewis v. Caraballo, 98 F.4th 521, 531 (4th Cir. 2024). "Ultimately, the overarching inquiry is whether the force that was used was proportional under the circumstances." Nazario v. Gutierrez, 103 F.4th 213, 234 (4th Cir. 2024).

"At the summary judgment stage, whether an officer's actions were objectively reasonable is a 'question of pure law.'" Payne, 172 F.4th at 415 (quoting Henry v. Purnell, 652 F.3d 524, 532 (4th Cir. 2011)); see also Armstrong v. Hutcheson, 80 F.4th 508, 513 (4th Cir. 2023) (collecting cases repeating this principle). "If, taking the facts in the light most favorable to the nonmovant plaintiff, the officer's actions were objectively reasonable, then the officer is entitled to judgment as a matter of law." Payne, 172 F.4th at 415. If, on the other hand, "there are genuine issues of material fact as to whether the officer's actions were objectively reasonable, summary judgment is not appropriate." Id.

Here, the first Graham factor—the severity of the crime—weighs in favor of the defendants. "This factor is intended as a proxy for determining whether an officer had any reason to believe that the subject of a seizure was a potentially dangerous individual." Id. at 416 (internal quotation marks and alterations omitted). At the time of the events in question, Tolbert was a fugitive from justice, and the defendants had been deployed to apprehend him on multiple outstanding warrants, including warrants for assault and battery of a law enforcement officer and felony eluding. See Lewis, 98 F.4th at 532 (noting that the first factor weighed against the plaintiff since "assault is an offense that can be considered violent if committed by any person") (internal quotation marks omitted). The defendants also had reason to believe that Tolbert would be armed. When Squad Six was contacted for assistance, the officers were advised that Tolbert possessed a machete with the intent to use it as a weapon. Additionally, Tolbert had reportedly shot a civilian's dog while evading arrest, Trooper Shaeffer had personally observed a dog that had been shot with a firearm in a structure believed to have been broken into by Tolbert, and Shaeffer had relayed that information to the rest of Squad Six.

The second and third Graham factors—whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect is actively resisting or attempting to evade arrest—weighed in the defendants' behavior at the beginning of their encounter with Tolbert. It is undisputed that Tolbert did not exit the bus after the defendants performed their initial knock and announce, or after they deployed flash-bang diversionary devices and OC spray. Instead, Tolbert crawled under the bed or mattress box in the back of the bus, and repeatedly failed to comply with orders to exit with his hands up. Additionally, upon being

ordered to enter the bus by Sergeant Mavredes, the defendants found a machete while attempting to get to Tolbert, but they still believed that he was possibly concealing another weapon, such as the firearm reportedly used to kill a dog. The record reflects that the defendants continued to maintain that belief at the time Trooper Lundy deployed his taser the first time.

Even if the first deployment of the taser was reasonable under the circumstances, however, as Tolbert arguably acknowledged at his deposition, "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." Meyers v. Balt. Cnty., 713 F.3d 723, 733 (4th Cir. 2013) (quoting Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005)). Although the defendants contend that Tolbert continued to actively resist arrest until after Trooper Lundy deployed his taser a second and third time, Tolbert's sworn statements indicate that the first deployment of the taser rendered him unconscious and unable to move or function. Based on Tolbert's account, which must be accepted as true for purposes of summary judgment, a reasonable jury could find that Tolbert no longer posed a threat and was no longer actively resisting arrest when the additional taser shocks were administered. Consequently, the court concludes that a genuine dispute of material fact exists as to whether the continued use of the taser was objectively reasonable under the circumstances. Given this dispute, summary judgment is not appropriate on the merits of the excessive force claim against the defendants. Payne, 172 F.4th at 415; see also Peroza-Benitez v. Smith, 994 F.3d 157, 170 (3d Cir. 2021) (emphasizing that whether a suspect was tased while visibly unconscious was "critical" to the reasonableness analysis); Merrill v. Seagraves, No. 6:22-cv-00007, 2025 WL 1905572, at *7 (E.D. Okla. Apr. 18, 2025), report and

recommendation adopted, 2025 WL 1795112 (E.D. Okla. June 30, 2025) (concluding that a plaintiff presented sufficient evidence to survive summary judgment as to the second application of a taser where the plaintiff asserted that "he was rendered immobile after the first use of the taser and that he was unable to comply with any instructions"); Smith v. City & Cnty. of Denver, No. 1:07-cv-00154, 2008 WL 724629, at *7 (D. Colo. Mar. 18, 2018) (concluding that "it is 'particularly clear from Graham itself' that it is a Fourth Amendment violation to tase an unconscious suspect") (quoting Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)).

In reaching this decision, the court recognizes that Tolbert testified at various points during his deposition that he could not "really remember" everything that transpired on the bus. Tolbert Dep. at 25; see also id. at 34 ("I was gone man. I couldn't really remember any of that."). However, "[v]ariations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all." Tippens v. Celotex Corp., 805 F.2d 949, 954 (11th Cir. 1986). Any necessary credibility determinations, including "determinations concerning witnesses' memories of events," are jury functions, not those of a court on summary judgment. Ecology Servs. v. GranTurk Equip., Inc., 443 F. Supp. 2d 756, 771 (D. Md. 2006); see also Zampierollo-Rheinfeldt v. Ingersoll-Rand De P.R., Inc., 999 F.3d 37, 53 (1st Cir. 2021) (noting that "a witness's lack of memory normally generates simply a credibility issue for the factfinder") (internal quotation marks omitted).

**B. Qualified Immunity**

The factual disputes identified above also preclude the grant of summary judgment based on qualified immunity. The doctrine of qualified immunity "protects government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." Danser v. Stansberry, 772 F.3d 340, 345 (4th Cir. 2014) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). When determining whether an official is protected by qualified immunity, the court must determine (1) whether the facts viewed in the plaintiff's favor make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the incident. See Stanton v. Elliott, 25 F.4th 227, 233 (4th Cir. 2022) (citing Pearson v. Callahan, 555 U.S. 223, 231 (2009)).

In this case, the court has already determined that the evidence presented by Tolbert, when viewed in his favor, is sufficient to withstand summary judgment on his claim of excessive force in violation of the Fourth Amendment. Thus, the court must decide whether the constitutional right at issue was clearly established. A right is clearly established if it is "sufficiently clear 'that every reasonable official would have understood that what he is doing violates that right.'" Reichle v. Howards, 566 U.S. 658, 664 (2012) (brackets omitted) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). In the Fourth Circuit, "[d]efendants bear the burden of proving that the unlawfulness of their conduct was not clearly established." Garrett v. Clarke, 74 F.4th 579, 584 (4th Cir. 2023) (citing Stanton, 25 F.4th at 233 & n.5).

Here, the defendants argue that no reasonable officer would have understood that deploying a taser three times was objectively unreasonable under the circumstances since

Tolbert "continued to resist arrest and remained non-compliant with his hands concealed after both the first and second use of a taser." Defs.' Mem. Supp. Mot. Summ. J., ECF No. 46, at 19 (citing Meyers, 713 F.3d at 733 (holding that the first three deployments of a taser did not amount to an unreasonable or excessive use of force since the suspect posed an immediate threat to the officers' safety and actively resisted arrest "until the third shock caused him to fall to the ground"). Viewing the evidence in the light most favorable to Tolbert, however, the very first shock rendered him unconscious and, thus, unable to comply with the officers' directives or actively resist arrest. And if Tolbert no longer "pose[d] a threat to the officers' safety and was not actively resisting arrest," a reasonable officer would have understood that delivering "additional taser shocks" violated the Fourth Amendment. Meyers, 713 F.3d at 734 –35 (holding that qualified immunity did not shield an officer from liability for allegedly administering seven additional taser shocks after the suspect fell to the floor and was secured by several officers). As the Fourth Circuit emphasized two years earlier, it is "clearly established . . . that officers may not use force against an incapacitated suspect," even if the person is armed. Estate of Jones v. City of Martinsburg, 961 F.3d 661, 669–70 (4th Cir. 2020); see also Peroza-Benitez, 994 F.3d at 171 ("There is a 'robust consensus of cases' that support the proposition that tasing a visibly unconscious person . . . is a violation of that person's Fourth Amendment rights.") (collecting cases). Consequently, the defendants are not entitled to summary judgment at this stage of the proceedings.

## V. Conclusion

For the reasons stated, the defendants' motion for summary judgment, ECF No. 45, is **DENIED**. An appropriate order will be entered.

Entered: September 22, 2026

Michael F. Urbanski
U.S. District Judge
2026.09.22
10:51:09 -04'00'

Michael F. Urbanski
Senior United States District Judge